IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

PARKER-HANNIFIN CORP.

    Plaintiff,

    v.

WIX FILTRATION CORP.

    Defendant.

No. Civ. 1:06-cv-98-DFL

MEMORANDUM OF OPINION AND ORDER

    Plaintiff Parker-Hannifin Corp. ("Parker") moves to preliminarily enjoin defendant Wix Filtration Corp. ("Wix") from selling the Wix 57314 oil filter elements, which Parker claims infringe its patent, U.S. Patent No. 6,986,426 ("the '426 patent"). For the reasons stated below, the court DENIES Parker's motion.

                                        I.

    Parker and Wix are large manufacturing concerns that make oil filter elements for motor vehicles. A replaceable oil filter element is one part of an engine's filtration system. The entire filtration system also includes the housing for the oil filter, an on-engine secondary fuel filter, and an on-frame-rail primary

1

1 fuel filter.  Parker designs and sells entire filtration systems
2 as well as replacement filters while Wix sells only the
3 replacement filter elements.  At issue in this case are the
4 after-market replacement oil filter elements Wix makes for the
5 Ford F Series 6.0 Liter diesel engine.  Parker designs and sells
6 the filter assemblies for the Ford F-150 and also sells
7 replacement oil filter elements for the same engines.  Parker
8 owns a patent on the filter elements it makes for the Ford F-150,
9 the '426 patent.  In this litigation, Parker claims that the Wix
10 replacement filter infringes the '426 patent.

11    In brief, the Parker filter element for the F-150 consists
12 of a paper cylinder with two plastic end caps.  The system is
13 activated by four protrusions on the first (top) end cap.  The
14 Wix filter also has a paper element and two end caps, and also is
15 designed to fit the F-150 housing and activate the filtration
16 system.  However, the second (bottom) end cap on the Wix filter
17 includes a plastic tube, over which the paper filter is placed.
18 The first (top) end cap fits over the end of the tube such that
19 the tube connects the two end caps and constitutes a core within
20 the filter element.  Inside the end of the tube are the necessary
21 protrusions to activate the filtration system.  The Parker filter
22 does not include such a plastic tube.  The ultimate question in
23 this patent infringement litigation is whether the plastic tube
24 distinguishes the Wix from the Parker filter.
25                                II.
26    The Parker '426 patent discloses a filter element that has

"an end cap assembly" consisting of: (1) "a first flat annular end cap sealingly bonded to the end of the filtration media" and (2) "a separate annular end piece located against a surface of the end cap."[1]  U.S. Patent No. 6,986,426 col.12 l.31-38 (filed on Jan. 17, 2006).  The end piece has a "a series of distinct, axially-projecting protrusions."  '426 Patent col.12 l.50-51.  The protrusions are important because they activate the

---

[1]  The '426 patent has 19 claims.  Claim one, one of two independent claims, is as follows:

> A filter element including a ring of filtration media circumscribing a central axis and having first and second ends; <u>an end cap assembly at the first end of the filter media including</u>: i) a first flat annular end cap sealingly bonded to the first end of the filtration media, and ii) <u>a separate annular end piece located against a surface of the first end cap</u>; and a second flat annular end cap sealingly bonded to the second end of the filtration media, the second end cap including a central opening along the central axis of the filter element, said end cap assembly at the first end of the filter element including a central opening along the central axis of the filter element, said central opening of said end cap assembly having a smaller diameter than said central opening of said second end cap, and being defined by an annular flange integral with an inner surface of said end cap assembly and projecting axially inward from said end cap assembly toward said second end cap and terminating at a point closer to said end cap assembly than said second end cap, said annular flange spaced radially inward from the ring of filtration media; and <u>a series of distinct, axially-projecting protrusions affixed to said annular end piece of the end cap assembly and spaced radially outward from said annular flange and radially between said flange and said ring of filtration media</u>, said protrusions projecting axially inward from said end cap assembly from said end cap assembly toward said second end cap and terminating at a point closer to said end cap assembly than said second end cap.

'426 Patent col.12 l.31-57 (emphasis added).

3

filtration system once the filter element is placed in the filter housing. In Figure 12, attached to this order, the patent gives "an elevated perspective view of a separate end piece with protrusions." '426 Patent col.5 l.29-30. The figure depicts an annular ring with four small protrusions perpendicular to its top surface.

Parker stated at oral argument that it currently does not make a filter element covered by the '426 patent. The Parker product closest to the filter described by the '426 patent is one covered by U.S. Patent No. 6,554,139 ("'139 patent"), of which the '426 patent is a continuation. The '139 filter element does not have a separate annular end piece. The four protrusions described in the '426 patent as placed on the end piece are instead directly attached to the interior of the first (top) end cap.

From the outside, the Wix filter element looks almost identical to the Parker filter element. But on the inside, the Wix filter has a plastic cylindrical tube in the center that projects from the second (bottom) end cap. The cylindrical filter paper slips over and onto the tube. According to Wix, the tube gives the filter element greater axial strength. The first (top) end cap of the Wix filter is an annular ring that fits onto the end of the cylindrical tube. The four protrusions are attached to the inside of the top of the tube and project inward, toward the second (bottom) end cap. Parker asserts that the plastic tube constitutes an "annular end piece" that infringes

4

1  its patent.

2      Parker further asserts that Ford recently has incurred numerous warranty claims for failed performance of fuel injectors on its diesel engine. Parker contends that problems with the fuel injectors began shortly after Wix started selling replaceable oil filter elements. Moreover, Parker claims that its own engineering tests show that Wix's elements are faulty. But Parker does not provide any direct evidence that any of the warranty claims resulted from a faulty Wix oil filter element. On the other hand, Wix claims that Ford's fuel injector problems predate the sale of its filter element by several years.

### III.

    A patent owner may obtain a preliminary injunction upon showing: (1) a reasonable likelihood that it would succeed on the merits; (2) a threat of irreparable harm; (3) the balance of hardships tips in its favor; and (4) the public interest favors granting the injunction. Jack Guttman, Inc. v. Kopykake Enter. Inc., 302 F.3d 1352, 1356 (Fed. Cir. 2002). "[The patent owner] must establish at the very least both of the first two factors, i.e., a likelihood of success on the merits and irreparable harm." Anton/Bauer, Inc. v. PAG, Ltd., 329 F.3d 1343, 1348 (Fed. Cir. 2003). To show a likelihood of success on the merits, it must demonstrate that: (1) any claims alleging that the patent is invalid or unenforceable "lack substantial merit"; and (2) it will likely prove infringement at trial. Id. As discussed below, the court denies Parker's motion for a preliminary

injunction because Parker fails to demonstrate that: (1) it is likely to succeed on the merits; and (2) it will suffer irreparable harm if the preliminary injunction is not granted. Because Parker has not established the first two factors, the court does not reach the remaining factors.

A. Infringement

Patent holders may prove infringement in two ways: (1) by showing literal infringement; or (2) by demonstrating infringement under the doctrine of equivalents. The doctrine of equivalents applies where the alleged infringer has made insubstantial changes to avoid literal infringement. In that case, infringement occurs when the defendant's product contains "each limitation of the patent claim or its equivalent." 60 Am. Jur. 2d Patents § 786 (2d ed. 2006). However, in this motion, Parker does not assert the doctrine of equivalents, choosing to rely solely on a theory of literal infringement to establish a likelihood of success on the merits.

In determining whether there is literal patent infringement, a court must conduct a two-step analysis. "First, a court must determine as a matter of law the correct scope and meaning of a disputed claim term." CCS Fitness, Inc. v. Brunswick, Corp., 288 F.3d 1359, 1365 (Fed. Cir. 2002). Second, it must compare the purportedly infringing device with its interpretation of the claims to determine whether that device contains all the limitations. Id.

"Claim interpretation begins with an examination of the

1  intrinsic evidence, i.e., the claims, the rest of the
2  specification and, if in evidence, the prosecution history." CCS
3  Fitness, Inc., 288 F.3d at 1366.  Courts generally give the terms
4  of a claim their ordinary and customary meaning. Id.  But "the
5  legal interpretation of the claim language can vary from the
6  language's standard meaning if the applicant has assigned a
7  particular meaning after filing, during the course of
8  prosecution."  1 R. Carl Moy, Moy's Walker on Patents § 4:45 (4th
9  ed. 2006).  Thus, a patent's prosecution history can be "the most
10 significant source of the legally operative meaning of disputed
11 claim language." Vitronics, Corp. v. Conceptronic, Inc., 90 F.3d
12 1576, 1582 (Fed. Cir. 1996).  Moreover, in the case of
13 continuation patents, the prosecution history of the parent
14 patent is also relevant to claim interpretation. Microsoft Corp.
15 v. Multi-Tech Sys., Inc., 357 F.3d 1340, 1349 (Fed. Cir. 2004).
16 "When multiple patents derive from the same initial application,
17 the prosecution history regarding a claim limitation in any
18 patent that has issued applies with equal force to subsequently
19 issued patents that contain the same claim limitation." Elkay
20 Mfg. Co. v. Ebco Mfg. Co., 192 F.3d 973, 908 (Fed. Cir. 1999).
21      Here, Parker has failed to establish a likelihood of
22 infringement and, thus, a likelihood of success on the merits,
23 because the scope and meaning of the term "separate annular end
24 piece" is not clear at this stage of the case.  Trial courts
25 usually interpret claims as a matter of law at a Markman hearing
26 where both sides provide an in-depth analysis of the claimed

invention and the prior art. 1 R. Carl Moy, Moy's Walker on Patents § 4:23 (4th ed. 2006). In this case, Parker has opted to move for a preliminary injunction before a <u>Markman</u> hearing. But without the benefit of a <u>Markman</u> hearing, the court is not in a position to interpret definitively the patent claims and their terms, including the term "separate annular end piece." And, as discussed below, because both Wix and Parker offer plausible arguments as to the proper definition of a "separate annular end piece," the court cannot find at this juncture that Parker's interpretation is the more likely correct.

The '426 patent offers sparse detail on the "separate annular end piece." It describes the end piece as only having "a series of distinct, axially-projecting protrusions" and being "located against a surface of the first end cap." '426 Patent col.12 l.35-36, 54-55. Figure 12 provides an embodiment of the end piece and depicts the end piece as an annular ring with four protrusions, which presumably is attached to the underside of the first (top) end cap.

Wix's filter elements do not possess any single part resembling the embodiment in Figure 12. But Parker contends that the whole of the cylindrical tube on the Wix filter elements qualifies as a "separate annular end piece" because it has protrusions on the underside of its top surface and it touches a surface of the top end cap, which fits onto the tube. Furthermore, Parker argues that Figure 12 is only a preferred embodiment or an example of an end piece that does not restrict

the scope and meaning of the term.

Although the Wix plastic tube might not be called an "end piece" in common parlance, given that it does not confine itself to an "end," Parker is correct that it is linguistically possible to describe the tube as a "separate annular end piece." But Wix has raised a substantial issue as to whether an end piece is limited to something similar to the embodiment in Figure 12. According to Wix, the Patent and Trademark Office examiner required Parker to amend the claims of the '139 patent, the parent of the '426 patent, by restricting the position of the protrusions to the first (top) end cap. Wix provides expert testimony that such placement was necessary to differentiate the invention claimed by the '139 patent from the prior art. Having disclaimed positioning the protrusions elsewhere during the prosecution of the '139 patent, Parker arguably cannot now contend that the patent covers protrusions that are not part of the first (top) end cap.

While Parker offers its own expert testimony arguing to the contrary, the court finds that both positions are plausible and that it cannot decide the issue from an incomplete record and before a <u>Markman</u> hearing. Parker conceded at oral argument that the field for oil filter elements is crowded, making it more likely that the amendments to the '139 patent were necessary to distinguish the claimed invention from prior art. Parker also admitted that, for the purposes of this litigation, it has not fully researched the breadth of the prior art and does not know

9

whether there are other patents for filter elements with protrusions not attached to the first (top) end cap. Given this uncertainty, the court is not in a position to find that Parker is likely to prevail on its infringement claim.

Moreover, if, as Parker seemingly contends, a "separate annular end piece" is simply a part with four protrusions, the '426 patent would bar any other person from making replacement filter elements. Any replaceable elements for the F-150 filtration system must have the same shape, the same dimensions, and, as Parker acknowledged at oral argument, four protrusions at the top. If placing four protrusions on a cylinder tube that extends the length of the filter element violates the '426 patent, it taxes the imagination to conceive of how a competitor could design a non-infringing replacement filter element. On an undeveloped record, the court declines to adopt an interpretation of the '426 patent that would have such sweeping consequences.

B. Irreparable Harm

Parker's position on irreparable harm is also unpersuasive. Mere loss in revenue from competition is not "irreparable harm" in a patent infringement suit when the plaintiff has failed to demonstrate that it will likely succeed on the merits. See Giantceutical, Inc. v. Ken Mable, Inc., 356 F. Supp. 2d 374, 381 (S.D.N.Y. 2005) (finding that a plaintiff who has failed to make a "clear showing of infringement and validity" cannot "rel[y] exclusively on the legal conclusions that the reduction of a patent holder's right of statutory exclusivity and the loss of

10

the patent holder's market share . . . constitute irreparable harm"). Potential lost revenue alone does not qualify as "irreparable harm" because, otherwise, there would be "irreparable harm" in every patent case. <u>Ill. Tool Works, Inc. v. Grip-Pak, Inc.</u>, 906 F.2d 679, 683 (Fed. Cir. 1990). Rather, Parker contends that Ford will unfairly blame Parker for problems attributable to the Wix filter. Parker claims that, since Wix began selling its replaceable oil filter elements, Ford began incurring numerous warranty claims for failed performance of fuel injectors on the Ford diesel engine. Parker also asserts that its own engineering tests show that Wix's elements are faulty. Therefore, according to Parker, the Wix filter is likely the cause of the failed fuel injectors. Nonetheless, Parker fears that Ford may attribute problems with the fuel injection system to the Parker filtration system, causing Ford to look for a different company to make its filtration systems.

Parker's line of reasoning is too speculative to amount to a likelihood of irreparable harm if a preliminary injunction is not issued. As Wix contends, Parker has not shown a direct nexus between Wix's filter elements and Ford's fuel injector problems. Moreover, Wix raises doubts about whether a correlation even exists between the warranty claims and Wix's sale and production of its filter elements. According to Wix, Ford began to experience problems with its fuel injectors several years before Wix began selling its filters. Finally, Parker's fear that Ford would blame Parker for problems caused by Wix's filters is

unsubstantiated.  Therefore, based on the record, the court cannot find that Parker is likely to suffer irreparable harm in the absence of a preliminary injunction.

IV.

For the reasons stated above, the court DENIES Parker's motion for a preliminary injunction.

IT IS SO ORDERED.

Dated: 10/24/2006

_____
DAVID F. LEVI
United States District Judge

Case 1:06-cv-00098-LJO-DLB  Document 76  Filed 10/24/06  Page 13 of 13



Fig. 12