1
2
3
4
5
6
7
8          **IN THE UNITED STATES DISTRICT COURT**

9          **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   PARKER-HANNIFIN CORPORATION,              CASE NO. CV F 06-0098 LJO DLB

12                    Plaintiff,              **ORDER ON CLAIM CONSTRUCTION**
                                             (Doc. 127 and 134)
13          vs.

14   WIX FILTRATION CORPORATION,

15                    Defendants.
     _____/
16

17   AND RELATED COUNTER-ACTION.

18   _____/

19

20          This is a patent case involving plaintiff Parker-Hannifin Corporations' ("Parker") oil filter

21   patents and fuel filter patents.  The filters are manufactured and sold by Parker for use in Ford F-series

22   trucks and E-series vans.  Parker is the original equipment manufacturer for the oil filters.  Both Parker

23   and Wix Filtration Corporation ("Wix") supply replacement (aftermarket) disposable cartridge fuel and

24   oil filter elements, including replacement oils and fuel filter elements for the Ford series trucks and vans.

25          Parker contends that Wix infringed on Parker's oil filter patents and the fuel filter patents.  Wix

26   has counter claimed on the grounds that the patents are invalid and for a declaration of noninfringement.

27   The Court finds the motion appropriate for decision without oral argument pursuant to Local Rule 78-

28   230(h).  Accordingly, the *Markman* hearing set for April 1, 2008 is VACATED.

                                             1

**FACTUAL OVERVIEW**

**A.**    **The patents in issue** (Patents-in-Suit)

·    U.S. Patent Nos. 6,554,139 ("the '139 patent"), 6,983,851 ("the '851 patent"), 6,986,426 ("the '426 patent"), and 7,086,537 ("the '537 patent) (collectively "**the oil filter patents**" or the "**'139 Patent Family**" )

·    U.S. Patent Nos. 6,797,168 ("the '168 patent"), 7,070,692 ("the '692 patent"), and 7,163,623 ("the '623 patent") (collectively "**the fuel filter patents**" or the "**'168 Patent Family.**")

One Wix product (part number 57314) has been accused of infringement of various claims of the '139 patent family, while three Wix products (part numbers 33599 primary, 33599 secondary, and 33899 secondary) have been accused of infringement of various claims of the '168 patent family.

**1.**    **Overview of the Oil Filter Patents/ '139 Patent Family**

The patents are generally directed to a filter element including various components that prevent a user from operating an engine without an oil filter element installed (or with an improper oil filter element installed). The manner in which the filter element accomplishes this is by preventing the user from attaching the filter housing lid without a filter element (or the proper element) in place. (Doc. 127, Parker Opening Markman Brief, p.3.)  All the oil filter patents include: a filter media (for purposes of filtering out particles based on size); an annular flange (for purposes of creating a flow path to the bypass valve–and hence the engine–in the event that the filter media becomes plugged); and protrusion(s) (for purposes of engaging a locking mechanism built into the filter housing that retracts when the proper protrusion alignment is inserted and allows the filter housing lid to be closed). In addition to these components common to all four patents, the '139 and '851 patent specifications further require "first and second end caps" and the '426 and '537 patent specifications further require "first and second end cap assemblies."  (Doc. 127, Parker Opening Markman Brief, p.3-4.)

**2.**    **Overview of the Fuel Filter Patents/ '168 Patent Family**

The patents are generally directed to a fuel filter element including various components that prevent a user from operating an engine without a filter element installed (or with an improper filter element installed). (Doc. 127, Parker Opening Markman Brief, p.4.) The manner in which the filter

element accomplishes this is by interacting with a valve-and-latch device built into the vehicle engine's filter housing that prevents the user from operating the filter housing, and thus the engine, without a filter element (or the proper element) in place.  All the patents include: a filter media (for purposes of filtering out particles based on size); an annular flange (for purposes of creating a flow path to the bypass valve—and hence the engine—in the event that the filter media becomes plugged); and protrusion(s) (for purposes of engaging a locking mechanism built into the filter housing that retracts when the proper protrusion alignment is inserted and allows the filter housing lid to be closed).  (Doc. 127, Parker Opening Markman Brief, p.4.)

**B.     The Anatomy of a Patent**[1]

A patent includes two basic parts:

(1) a written description of the invention, which may include drawings and which is referred to as the "specification" of the patent; and

(2) the patent claims.

The cover page of the patent provides identifying information including the date the patent issued and the patent number along the top, as well as the inventor's name, the filing date, and a list of the prior art publications considered by the U.S. Patent Office in issuing the patent.

The specification of the patent begins with an Abstract, found on the cover page.  The Abstract is a brief statement about the subject matter of the invention.  The drawings of the invention follow the abstract. The drawings depict various aspects or features of the inventions and the embodiments of the claims.  The written description of the invention appears next.  In this portion of the patent, each page is divided into two columns, which are numbered at the top of the page.  The written description of the patent begins at column 1, line 1.  The written description includes a background section, a summary of the invention, a detailed description of the invention, among other things.

By statute, each issued patent concludes with one or more "claims" that particularly point out and distinctly claim the patented invention.  35 U.S.C. §112, ¶¶1-2 ("Section 112.")  The first paragraph of Section 112 states that:

---

[1] The text is found in the ABA Patent Litigation Model Jury Instructions. *Model Jury Instructions: Patent Litigation*, 2005 A.B.A. Sec. Litigation 7-9.

> "The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same . . ."

Thus, the statutory requirement is that the specification describe the claimed invention in "full, clear, concise and exact terms." The second paragraph of section 112 provides that:

> "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

Section 112 thus requires a "definiteness" in claims to "ensure that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude." *Datamize, LLC. v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005).

## C.      The Importance of the Patent Claims

The specification is followed by one or more numbered paragraphs. These are called the patent **claims**. The claims may be divided into a number of parts or steps, which are referred to as "claim limitations." For instance, the claims for the '139 patent begin at Col. 12, line 20. The claims for the '168 patent begin at Col. 14, line 62. (See Doc. 139, Exh. 1, 139 Patent; Doc. 139, Exh. 5, '168 Patent.)

The claims of a patent are a main focus of a patent case because the claims define the patent owner's rights under the law. The claims define what the patent owner may exclude others from doing during the term of the patent. The claims of the patent serve two purposes. First, the claims state the boundaries of the invention. Second, they provide notice to the public of those boundaries. Thus, when a product is accused of infringing a patent, it is the patent claims that must be compared to the accused product to determine whether or not there is infringement. It is the claims of the patent that are infringed when patent infringement occurs. The claims are also at issue when the validity of the patent is challenged. *Model Jury Instructions: Patent Litigation*, 2005 A.B.A. Sec. Litigation 7-9.

There are two basic forms of claims, independent and dependent. Independent claims are free-standing claims. The scope of an independent claim can therefore be determined by referring to that claim only and not to any other claims in the patent. For instance, Claim 1 of the '139 patent is an independent claim. (See Doc. 139, Exh. 1, 139 Patent.) Dependent claims, in contrast, incorporate the contents of a preceding claim by reference. 35 U.S.C. § 112, ¶ 4; 37 C.F.R. § 1.75( c) ("One or more

4

1   claims may be presented in dependent form, referring back to and further limiting another claim or

2   claims in the same application."). The scope of a dependent claim cannot be ascertained without

3   referring to the claim from which it depends. For instance, Claims 2 and 3, among others, of the '139

4   patent are dependent claims. (See Doc. 139, Exh. 1, 139 Patent.)

5   **D.     Claim Construction**

6           A patent is a written instrument, and therefore, the judge bears the responsibility for all patent

7   interpretation issues. *Markman v. Westview Instruments*, 517 U.S. 370, 390, (1996).  A key issue in

8   interpretation of a patent language, is the interpretation of the words in the patent's claims, called "claim

9   construction." *Markman*, 517 U.S. at 390.  *Markman* holds that claim construction is a matter of law

10  to be decided exclusively by judges.  Analysis of a patent infringement claim contains two steps: "The

11  first step is determining the meaning and scope of the patent claims asserted to be infringed.... The

12  second step is comparing the properly constructed claims to the device accused of infringing." *Markman*

13  *v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed.Cir.1995) (en banc), *aff'd*, 517 U.S. 370, 116 S.Ct.

14  1384, 134 L.Ed.2d 577 (1996).

15          The first step, claim construction, is presently before this Court.  In addition, the parties have

16  filed motions for partial summary judgment on whether Wix's devices infringe, which are also pending

17  and which will be separately decided.

18          As discussed below, there are four principle sources of evidence that the trial court may use in

19  construing claims: (1) the language of the claims; (2) the patent specification; (3) the prosecution history;

20  and (4) limited extrinsic evidence to assist with understanding the background technology and the state

21  of the art. Claim construction begins with an examination of the intrinsic evidence, i.e., items (1) – (3)

22  above. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *See, e.g.*, *Graham*

23  *v. John Deere Co.*, 383 U.S. 1, 33 (1966) ("It is, of course, well settled that an invention is construed not

24  only in the light of the claims, but also with reference to the file wrapper or prosecution history in the

25  Patent Office... . Claims as allowed must be read and interpreted with reference to rejected ones and to

26  the state of the prior art; and claims that have been narrowed in order to obtain the issuance of a patent

27  by distinguishing the prior art cannot be sustained to cover that which was previously by limitation

28  eliminated from the patent.").

1          **1.      Claim Construction Begins with the Words of the Claims**

2          It is a "bedrock principle" of patent law that "the claims of a patent define the invention to which

3   the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed.Cir.

4   2005), *cert. denied,* 546 U.S. 1170 (2006).  Claim construction centers on the words actually used in the

5   claims.  *Inno/Pure Water, Inc v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).

6   Claims construction "begins and ends" with the actual word of the claims.  *Scanner Techs Corp. v. ICOS*

7   *Vision Sys. Corp. N.V.*, 365 F.3d 1299, 1303 (Fed Cir. 2004).

8          Words in a claim can acquire meaning from various sources (1) the ordinary use of the English

9   language, (2) the customary use by a group (e.g., a trade, professional, scientific or technological group)

10  or (3) the particular use within in the patent or its prosecution history.  *See Vitronics Corp. v.*

11  *Conceptronic*, 90 F.3d at 1582 ("[R]egardless of how those skilled in the art would interpret a term in

12  other situations, where those of ordinary skill, on a reading of the patent documents, would conclude that

13  the documents preclude the term being given the meaning propounded by the expert witnesses, we must

14  give it the meaning indicated by the patentee in the patent claim, specification and file history.").

15         In *Phillips,* 415 F.3d 1303, 1313, *cert. denied*, 126 S.Ct 1332 (2006), the court stated that claim

16  interpretation begins with determining how a person of ordinary skill in the art understands a claim term

17  as of the filing date of the patent application.  "Such a person is deemed to read the words used in the

18  patent documents with an understanding of their meaning in the field, and to have knowledge of any

19  special meaning and usage in the field." *Id.* at 1313. Second, and importantly, the person "is deemed

20  to read the claim term not only in the context of the particular claim in which the disputed term appears,

21  but in the context of the entire patent, including the specification."  415 F.3d at 1313.

22         Words of a claim "are generally given their ordinary and customary meaning." *Phillips v. AWH*

23  *Corp.*, 415 F.3d at 1312.  "[T]he ordinary and customary meaning of a claim term is the meaning that

24  the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e.,

25  as of the effective filing date of the patent application." *Id.*;  *Home Diagnostics, Inc. v. LifeScan, Inc.*,

26  381 F.3d 1352, 1358 (Fed.Cir. 2004) ("customary meaning" refers to the "customary meaning in [the]

27  art field").  A judge cannot add or subtract words from the claims. *Callicrate v. Wadsworth Mfg., Inc.*,

28  427 F.3d 1361, 1369 (Fed Cir. 2005).  The objective is to determine the "acquired meaning" of the claim

1  language actually used.  *Markman*, 517 U.S. at 388; *Riles v. Shell Exploration,* 298 F.3d 1302 , 1310
2  (Fed Cir. 2002).

### 2.   Claims Must Be Read In Light Of The Specification

4  The specification may resolve ambiguous claim terms "where the ordinary and accustomed
5  meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be
6  ascertained from the words alone." *Teleflex, Inc.* v. Ficosa *North America Corp.*, 299 F.3d 1313, 1325
7  (Fed. Cir.2002). But, "[a]lthough the specification may aid the court in interpreting the meaning of
8  disputed claim language, particular embodiments and examples appearing in the specification will not
9  generally be read into the claims." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187
10 (Fed.Cir.1998). Patent claims are not limited to the embodiments set forth in the specification.  *Phillips,*
11 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the
12 invention, we have repeatedly warned against confining the claims to those embodiments.").

13 Only the claim language that is in dispute needs to be construed.  *Vanderlande Industries*
14 *Nederland BV v. I.T.C.*, 366 F.3d 1311, 1323 (Fed. Cir. 2004) (claim limitation was not in dispute when
15 the ALJ construed the claims, and thus there was no reason for the ALJ to set out a formal construction.)

### 3.   Patent Prosecution History

17 The U.S. Patent an Trademark Office is the agency which examines patent applications and
18 issues patents.  Patent applications are assigned to a Patent Examiner who determines whether an
19 invention meets the requirements for patentable inventions.  If the Patent Examiner rejects the patent,
20 the applicant may respond with arguments to support the claims, by making changes to the claims, or
21 submitting new claims.  This process, from the filing of the patent application to the issuance of the
22 patent is call "patent prosecution."  *Model Jury Instructions: Patent Litigation*, 2005 A.B.A. Sec.
23 Litigation 10.  The record of papers relating to the patent prosecution is the "prosecution history."  The
24 prosecution history of the patent before the patent office also provides evidence of how the patent office
25 and the inventor understood the use of certain terms of the patent.  *Philips*, 415 F.3d at 1317.

### 4.   Use of Extrinsic Evidence

27 Extrinsic evidence is any evidence not part of the claims, specification or prosecution
28 history of the patent at issue. Extrinsic evidence, such as expert testimony and dictionaries, can

1    be used if needed to assist in determining the meaning or scope of technical terms in the claims.

2    *Vitronics Corp.*, 90 F.3d at 1583.  Extrinsic evidence may be considered in claim construction, as

3    long as it is not used to vary or contradict the intrinsic evidence.  *Pitney Bowes, Inc. V. Hewlett -*

4    *Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999).

5

6                                    **PART 1**

7                        **CLAIM CONSTRUCTION IN THE**

8              **OIL FILTER PATENTS ('139 PATENT FAMILY)**

9

10   **A.       The '139 Patent Family**

11           The '139 patent family relate to a canister-type oil filter that in operation is housed in a

12   canister on the engine body and accessed by removing a cap.  The claims of the patents at issue are

13   only directed to the filter element itself. The locking mechanism on the support core in the filter

14   housing is not claimed in the claims.  An "exploded" version of the oil filter is shown below.

15   /////

16   /////

17   /////

18   /////

19   /////

20   /////

21   /////

22   /////

23   /////

24   /////

25   /////

26   /////

27   /////

28   /////

                                        8



In this Figure, "Figure 3" of the patent, the housing 32 holds a removable filter element 36. The filter element is placed in the housing and an opening in the center of the filter element allows it to slide over support core 56. When the filter element is inserted, the housing cap 34 can be screwed on to close the housing.

Fig. 7

9

1  Figure 7 shows the <u>bottom</u> or <u>underside</u> of the top end cap, labeled 114 on Figure 3. The end cap has

2  a central annular flange 130, and a series of protrusions 116.

3         In Figure 3, the protrusions on the inner surface of the top end cap, shown in Figure 3, unlock

4  a locking mechanism and allow it to retract into the support core. When the proper filter element is

5  inserted into the housing, the protrusions mate with corresponding openings in the locking member.

6  The protrusions force the locking member axially downward. This force allows the end of the bypass

7  element 76 to move inward, off ledge 68, and allows the entire mechanism to slide inside the support

8  core, which in turn allows the screw cap 34 to be screwed onto the housing. (Doc. 139, Ex. 1, '139

9  patent, col. 8, lines 7-30.)

10

11         ------------------------------------------------------------------

12

13         On February 29, 2008, the parties filed a "Joint Claim Construction Chart" wherein they

14  narrowed the claim terms to be construed by this Court.  (Doc. 188.)  The Disputed Terms and the

15  Parties' Proposed Constructions for  U.S. Patent Nos. 6,554,139 ("the '139 patent"), 6,983,851 ("the

16  '851 patent"), 6,986,426 ("the '426 patent"), and 7,086,537 ("the '537 patent) are referred to as the

17  "oil filter patents" and also as the "'139 patent family" by the parties are as follows:

18  **A.  "Integral"**

19         **Parker's Proposed Construction**: "composed on integrated parts."

20         **Wix's Proposed Construction**: "formed in a single piece."

21         **1.      Parker's Position**

22         Parker argues that it specifically defined the terms "integral" and "unitary" during the

23  prosecution of the '139 patent.  In responding to a PTO's examiner's point that the two terms are

24  synonymous, Parker responded that the "integral" means "composed of integrated parts" which is

25  broader than "unitary."  (Lambert Decl ¶3, Exh.1.)  Because two different words are used "unitary"

26  and "integral," they must have different meanings and unitary is broader than integral.  An example

27  of where "unitary," means "in one piece," is where its component parts "are each preferably formed

28  **unitary (in one piece)** by appropriate techniques, such as injection molding, vacuum-forming or

10

1  drawing." ('139 patent col. 11:1-4; '851 patent col. 11:8- 11; '426 patent col. 11:10-13; '537 patent

2  col. 11:10-13) (emphasis added.)

3      Parker also argues that "integral" cannot be construed to mean a single, inseparable, "unitary"

4  piece in the oil filter patents because of its use elsewhere in the patents.  Claim 12 of the '426 patent

5  states: "the end piece located in sealing relation with the first end cap **to form an integral** end cap

6  assembly . . . ." ('426 patent col. 13:29-32) (emphasis added.)

7      **2.      Defendant Wix's Position**

8      In the '139 patent, the annular flange is always shown as formed from a single piece with the

9  top end cap.  The drawing shows that the central flange is formed of a single piece with the top end

10  cap.  The specification states: "The flange and protrusions can be easily formed with the end cap

11  such as by molding the end cap as a unitary component. . . ." (Ex. 1, '139 patent, col. 4, lines 4-6

12  (emphasis added).)  The specification describes a retaining device 174 in the housing canister that is

13  formed "integral with" the sidewall or end wall of the housing canister – indicating formed in a

14  single piece  (Ex. 1, '139 patent, col. 10, lines 45.)  The prosecution history of the '139 patent also

15  indicates that the PTO understood the word "integral" to be synonymous with "unitary," which

16  means "in one piece."

17      **3.      Claim Construction for "Integral"**

18      The term "integral" is used in relation to the annular flange in the first end cap.  As the term

19  "integral" is generally used: "said central opening of said first end cap being defined by an annular

20  flange **integral** with said first end cap . . ." (See e.g., Doc. 139, '139 Patent Col. 12, lines 31-34;

21  '851 Patent, Claim 1; '426 Patent, Claim 1 ("an annular flange integral with an inner surface of said

22  end cap assembly"); '537 Patent, Claim 1.)  Figure 7 is an underside view of the upper end cap for

23  the filter element.  ('139 Patent, col. 5.)  This figure shows the bottom or underside of the top end

24  cap, labeled 114. The end cap has a central flange 130, and a series of protrusions 116.

25  /////

26  /////

27

28



Fig. 7

The specification states: "The flange and protrusions can be easily formed with the end cap <u>such as by molding the end cap as a unitary component</u>. . . ." (Doc. 139 Ex. 1, '139 patent, col. 4, lines 4-6 (emphasis added).)  Wix argues that the annular flange is always shown, or "embodied," as formed from a single piece with top end cap.

Parker argues that Wix, by citing to the specifications and embodiment of the end cap, attempts to limit the invention to what is shown in the embodiment, i.e., Figure 7. The Court disagrees.  Wix has presented the specifications to show how the Court should interpret the term "integral."  By looking to the embodiment and the words used to describe the embodiment, the Court may ascertain the construction of the term. A district court does not import additional limitations into the claim when it looks to the specification to aid its interpretation of a term already in the claim, an entirely appropriate practice.  *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.,* 93 F.3d 1572, 1578 (Fed Cir. 1996).

The claims of an invention do not stand alone. Rather, they are part of "a fully integrated written instrument," *Markman*, 52 F.3d at 978, consisting principally of a specification that concludes with the claims. For that reason, claims "must be read in view of the specification, of which they are a part." *Id.* at 979.  Claims always "must be read in view of the specification, of which they are a part." *Phillips*, 415 F.3d at 1315. The distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim can be a difficult one to apply in practice. *See Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186-87 (Fed.Cir.1998) ("there is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification").

Here, the specification states that flange should be molded as a single unit with the top end

12

cap. This "as a single unit" is consistent with the term "integral." Indeed, other courts which have construed "integral with" have concluded the same. In claim construction in *Vanguard Products Corp. v. Parker Hannifin Corp.*, 234 F.3d 1370, 1371 (Fed. Cir. 2000), the court construed the term "integral with." The trial court used the specification, in conjunction with a dictionary definition, to determine how the product was described. On appeal, the Federal Circuit found that the trial court did not err is resorting to a dictionary definition of "integral." In *Vanguard*, the court stated "'integral' is used here in its ordinary sense to mean formed as a unit with another part, and therefore, 'integral therewith' means that the outer layer of the gasket is formed as a unit and in direct contact with the inner layer of the gasket." *Vanguard Products Corp. v. Parker Hannifin Corp.*, 234 F.3d at 1371; *But see Phillips v. AWH Corp.*, 415 F.3d at 1317 (disapproving placing too much reliance on extrinsic sources such as dictionaries, treatises, and encyclopedias).

Here, "integral" is not defined. There is nothing in the claims or specifications that indicate that "intregal" requires more than one part as Parker argues. Once parts are integrated, they are one piece. Parker argues that construing two different claim terms - "unitary" and "integral" - as having the same meaning contravenes an important canon of claim construction. For example, claims 7 and 15 of the '139 patent uses both terms, "unitary" and "integral." Parker argues these two different terms must have different meanings. *See Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006) ("[T]he use of two terms in a claim requires that they connote different meanings . . . .").

However, both terms define the relationship of a component to the end cap. The term "integral" defines the relationship between the annular flange and the end cap. The term "unitary" defines the relationship between the protrusions and the first end cap. Thus, it is not so much that these two common terms, unitary and integral, have *different meanings,* but that they *refer to the relationship between different structures.*

Parker argues that the prosecution history makes clear that "unitary" and "integral" have different meanings. In the June 7, 2001 Office Action, the Examiner rejected the use of the claim limitation "unitary" (in connection with the protrusions) because "unitary" did not further limit the "integral" protrusions. In other words, the Examiner said that "integral with the first end cap" and

"unitary with the first end cap" were synonymous. (Ex. 12, '139 file history, 6/7/01 Office Action, at

5.)  Parker argues, that in response to that Office Action on June 20, 2001, Parker explained to the

Examiner that "the term 'unitary' commonly means 'undivided'; while the term 'integral' commonly

means 'composed of integrated parts', and therefore is broader than the term 'unitary'. . . ." (June 20,

2001  amendment (Lambert Decl. Ex. A).)  In further correspondence on the issue between the PTO

and Parker, the PTO noted that Parker disagreed that "unitary and integral" have the same meaning:

> "While Applicant respectfully disagrees (the term "unitary" commonly
> means "undivided"; while the term "integral" commonly means
> "composed of integrated parts", and therefore is broader than the term
> "unitary" - see, e.g., Webster's Ninth New Collegiate Dictionary
> (1996)), Applicant has removed the term "integral" from claim 18, and
> so this rejection and objection should be moot." (Doc. 139, Ex. 13,
> June 15 2001 Amendment.)  Parker notes that the claims subsequently
> issued using both "unitary" and "integral" in the same claim, thus
> confirming that the terms had different meanings.

The prosecution history can often inform the meaning of the claim language by

demonstrating how the inventor understood the invention and whether the inventor limited the

invention in the course of prosecution, making the claim scope narrower than it would otherwise be.

"Yet because the prosecution history represents an ongoing negotiation between the PTO and the

applicant, rather than the final product of that negotiation, it often lacks the clarity of the

specification and thus is less useful for claim construction purposes." *Phillips,* 415 F.3d at 1317;

*Teleflex*, 299 F.3d at 1325 ("[T]he prosecution history may demonstrate that the patentee intended to

deviate from a term's ordinary and accustomed meaning, i.e., if it shows the applicant characterized

the invention using words or expressions of manifest exclusion or restriction during the

administrative proceedings before the Patent and Trademark Office.")

Here, the prosecution history does not clarify the terms.  Initially, the PTO disallowed the

claim terms "unitary" and "integral," as they were synonymous.  Parker, in turn, argued to the PTO,

as it does to this Court, that the terms are distinct.  The prosecution history indicated that Parker

withdrew the term "integral," yet the patent issued with the term "integral."  This prosecution history

does not lend clarity to the definition of the terms "integral" and "unitary."  *See Athletic Alternatives,*

*Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1580 (Fed.Cir.1996) (the ambiguity of the prosecution

history made it "unhelpful as an interpretive resource" for claim construction).

Parker further argues that it acted as its own lexicographer by defining its own terms in the prosecution history. *See Elekta Instrument S.A. v. O.U.R. Scientific Intern., Inc.*, 214 F.3d 1302, 1307 (Fed.Cir. 2000) ("a patentee can act as his own lexicographer to specifically define terms of a claim contrary to their ordinary meaning.")  Parker cites *Guttman, Inc. v Kopykake Enters., Inc.*, 302 F.3d 1352, 1360 (Fed. Cir. 2002) for the proposition that "[Where a] a patentee has clearly defined a claim term, that definition usually is dispositive; it is the single best guide to the meaning of the term."  In *Guttman*, however, the term to be constructed was actually defined in the specification. In the instant case, the term "integral" is not so defined.

For the reasons discussed above, the Court construes the term "integral" to mean formed in a single piece.

**B.   "End cap assembly"**

**Parker's Proposed Construction:** "collection of components including or comprising an end cap."

**Wix's Proposed Construction:** "the combination of a flat annular end cap and a separate annular end piece (as shown in Figure 12) located against the inner (i.e. underside) surface of the end cap."

### 1.   Parker's Position

The independent claims of '426 and '527 patents contain the limitation directed to an end cap assembly.  An "assembly" is comprised of multiple components.  In addition, Parker specifically defined an "end cap assembly"and used an open-ended transitional term "including" so that the end cap assembly embraces at least the elements listed and probably more.  It means "a collection of components **including or comprising** an end cap assembly."

It would be an improper construction to limit the claim language to an embodiment set forth in the patent specification, and would fail to give the claim language its proper breadth. *See Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1341 (Fed. Cir. 1999) ("[A]n attribute of the preferred embodiment cannot be read into the claim as a limitation.").

### 2.   Wix's Position

The claims require that the end cap assembly include both a "first flat annular end cap" and a

15

1    "separate annular end piece located against a surface of the first end cap."  Wix argues that the only

2    meaning that can reasonably be ascribed to "end cap assembly" is the combination of a separate

3    annular end piece 160 as shown in Figure 12, fit against the inside surface of a flat annular end cap

4    such as the one shown in Figure 7, without the protrusions.



Fig. 12

3.      **Claim Construction of "end cap assembly"**

The term "end cap assembly" is used in the claim of the '426 and the '537 patents.

The '426 Patent:

> o Independent Claim 1: ". . . **an end cap assembly** at the first end of
> the filter media **including** i) a first flat annular end cap sealingly
> bonded to the first end of the filtration media, and ii) a separate annular
> end piece located against a surface of the first end cap; . . . ."

> o  Independent Claim 12: ". . . the first end cap having a surface
> sealingly bonded to a surface at the first end of the filtration media and
> the end piece located in sealing relation with the first end cap **to form
> an integral end cap assembly** . . . ."

> o  Independent Claim 16: ". . . an **end cap assembly** at the first end of
> the filter media having a first annular end cap sealingly bonded to the
> first end of the filtration media , and a second annular end cap
> sealingly bonded to the second end of the filtration media . . . ."

The '537 Patent:
> o  Independent Claim 1: ". . . an **end cap assembly** at the first end of
> the filter media **including** I) a first flat annular end cap sealingly
> bonded to the first end of the filtration media, and a separate annular
> end piece located in sealing relation with the first end cap; . . . ."

> o  Independent Claim 12: ". . . an **end cap assembly** at the first end of
> the filter media **including** i) a first flat annular end cap sealingly
> bonded to the first end of the filtration media,  and ii) a separate
> annular end piece located against a surface of the first end cap; . . . "

1

2      Here, Parker used an open-ended transitional phrase to define an "end cap assembly."  An

3  open-ended transitional term, such as "including," means the claim embraces at least the elements

4  subsequently recited and potentially more. Unrecited elements are not excluded from the claim's

5  scope. *CollegeNet, Inc. v ApplyYourself, Inc.*, 418 F.3d 1225, 1235 (Fed. Cir. 2005) ("A drafter uses

6  the term 'comprising' to mean 'I claim at least what follows and potentially more."); *Nazomi*

7  *Communications, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1370 (Fed.Cir. 2005) ("'Comprising' is

8  often synonymous with 'including'").  Therefore, by using the term "including" in the claim, Parker

9  did not limit or redefine "end cap assembly" to merely the components which follow and no other

10  components.  The language has the practical effect of limiting the scope of the end cap assembly to

11  require **at least** the recited elements.

12      Therefore, the Court construes the end cap assembly as:  collection of components

13  comprising the end piece of at least a combination of a flat annular end cap and a separate annular

14  end piece.

15  **C.     "Annular"**

16      **Parker's Proposed Construction:** "configured or arranged as either a continuous, or a

17  noncontinuous, ring."

18      **Wix's Proposed Construction:** Wix contends the term "annular" in the '139 patents is not

19  disputed and need not be constructed by the Court.  Wix contends "Annular base" is disputed in the

20  '168 patents.

21      **1.     Parker's Position**

22      The independent claims of the oil filter patents contain a limitation for an "annular" end cap.

23  A structure that is "annular" means configured or arranged as a ring. This ring can either be

24  continuous (e.g., "annular base 82" at Fig. 3, 8 of the oil filter patents; "annular flange 86" at Fig. 5

25  of the oil filter patents) or non-continuous, i.e., spaced (e.g., "protrusions 116 . . . in a generally

26  evenly-spaced annular arrangement" at Fig. 7, 12 of the oil filter patents).  The specification and

27

28

claims do not require "annular" to be a continuous ring-shaped disk.



### 2.    Wix's Position

Wix contends that "annular" does not need to be constructed in the '139 patent family.  The issue of "annular base" is squarely presented for construction in the '168 patent family, discussed below.  "Annular" has a plain meaning - ring-shaped.  The plain meaning does not mean "noncontinuous ring."

### 3.    Claim Construction of "Annular"

Annular means ring shaped.  According to Merriam-Wester's Collegiate Dictionary, the term "annular" means "of, relating to, or forming a ring."   Merriam-Wester's Collegiate Dictionary, 40 (11th Ed. 2003).  *Phillips*, 415 F.3d at 1322 (we do not intend to preclude the appropriate use of dictionaries" as long as they do not "contradict any definition found in or ascertained by a reading of the patent documents.") Annular does not mean non-continuous ring.

1    Parker cites to Fig. 7, 12 of the oil filter patents, *supra*, pointing out that the protrusions are

2    not continuous and are "<u>in a generally evenly-spaced annular arrangement</u>." (Doc. 139, Exh. 1, '139

3    Patent, col 7, lines 60-63.)  This phrase, however, does not define annular as "non-continuous."  The

4    words "evenly spaced" modify the word "arrangement;" "evenly spaced" does not modify "annular."

5    Thus, the phrase means that the protrusions are in a ring arrangement and evenly spaced.

6    In further support of Parker's construction of "annular", it submits evidence of its expert,

7    Charles Garris, Ph.D.  Dr. Garris testifies that additional patents, not in-issue, where the term

8    "annular" refers to a "non-continuous" ring and that the term is consistent in mechanical engineering

9    and automotive technology.

10    Dr. Garris's testimony is extrinsic evidence. Extrinsic evidence "consists of all evidence

11    external to the patent and prosecution history, including expert and inventor testimony, dictionaries,

12    and learned treatises." *Phillips*, 415 F.3d at 1317. Indeed, Dr. Garris' testimony consists of extrinsic

13    evidence on two levels.  First, his interpretation of the term "annular" is extrinsic to the patents.

14    Moreover, his reliance upon patent language from patents not in issue is extrinsic evidence.  Such

15    evidence is "less significant than the intrinsic record in determining 'the legally operative meaning of

16    claim language.'" *Phillips*, 415 F.3d at 1317.  While his testimony that "annular" is used in the

17    mechanical and automotive technology as a non-continuous ring, the patents-in-issue do not use the

18    term in this manner.

19    **D.    "Separate Annular End Piece"**

20    **Parker's Proposed Construction**: "a piece at the end of the filter, annular in shape, that is

21    separate from the other components comprising the end cap assembly."

22    **Wix's Proposed Construction:** "a stand-alone annular member with protrusions, as shown

23    in Figure 12."

24    **1.    Parker's position**

25    This is one of the components identified by the claims that in part comprises the "end cap

26    assembly."  The proper definition of "separate" needs no explanation, and "annular" has been

27    defined infra. The term "end piece" has its plain and ordinary meaning.  In fact, Figure 12 was

28    specifically identified as an embodiment of the separate annular end piece component of the end cap

19

assembly.  However, it would be improper to limit the claim term to the embodiments depicted in the specification.

### 2.    Wix's Position

The term "separate annular end piece" is used in a number of claims of the '426 and '537 patents. A representative example is claim 1 of the '426 patent:

> 1. A filter element including a ring of filtration media circumscribing a central axis and having first and second ends; an end cap assembly at the first end of the filter media including I) a first flat annular end cap sealingly bonded to the first end of the filtration media, and ii) a separate annular end piece located against a surface of the first end cap; and a second flat annular end cap sealingly bonded to the second end of the filtration media. . .  (Ex. 3, '426 patent, col. 12, lines 31-57.)  Figure 12 illustrates the end piece 160:



As shown in Figure 12, the "separate annular end piece" is an annular (ring shaped) piece, separate from other pieces that have the protrusions formed into one side of it. Thus, the "separate annular end piece" of the claims of the '426 and '537 patents should be construed to be a stand-alone annular member with protrusions.

### 3.    Claim Construction of "Separate Annular End Piece"

The parties agree that the only section of the specification relevant to this "separate annular end piece" is a single paragraph in column 10, along with Figure 12:

> A further embodiment of the filter element of the present invention is illustrated in FIG. 12. In this embodiment, the protrusions 116 are formed in a separate end piece 160. End piece 160 has an annular configuration, and fits against the inside surface of the end cap 114. The end piece 160 can be permanently fixed to the end cap, such as with adhesive, or can merely be located against the end cap and held in

place by friction fit, or by the interaction with the locking member 76.
The angled or helical distal end surfaces of the protrusions are clearly
visible in this Figure. The remainder of the filter element is preferably
the same as described previously. (Doc. 139, Exh. 1, '139 patent, col.
10, lines 10-20;6 see also Ex. 28, Garris 10/26/07 Report, at 34.)

Parker cites *Agfa Corp. v. Creo Products Inc.*, 451 F.3d 1366, 1376 (Fed. Cir. 2006) for the

proposition that the  depiction of a single embodiment in a patent cannot limit the claims to that

depicted scope.  In *Agfa*, the claim term of a "stack" was at issue.  The dispute was whether a "stack"

of plates had to be vertically arranged or whether the "stack" could be "arranged in an orderly

fashion, regardless of vertical or horizontal orientation."  The alleged infringer argued that a claim

term of "stack" covered only the depiction in a Figure in the specification. The Court, however,

refused to limit "stack" to the depiction.  "This case illustrates again the reason for this court's refusal

to limit broader claim language to a preferred embodiment in the patent specification. Of necessity,

any depiction of any stack will necessarily show that stack arranged in a particular manner." *Id.*  At

1376.  Thus, the claim term cannot be limited to the depiction.

Parker proposes that the claim term mean "a piece at the end of the filter, annular in shape,

that is separate from the other components comprising the end cap assembly."  Parker's construction

is too broad in relation to the words claimed:  "In this embodiment, the protrusions 116 are formed in

a separate end piece 160."  (Doc. 139, '426 patent col. 10, lines 20-30; '537 patent col. 10:20-30.)

Significant to this language is the **existence of protrusions** on the separate end piece.  Any

construction which excludes "protrusions" does not properly construct the language. Just having a

piece at the end which is annular in shape does not include the necessary element of the protrusions.

This construction does not limit the construction to the embodiment of the separate end piece

in Figure 12, contrary to Parker's argument.  The end piece needs to be separate and attachable at the

end, with protrusions.  This construction is entirely consistent with the language of the specification.

The specifications "describe the manner and process of making and using" the patented invention.

*Phillips*, 415 F.3d at 1315.  Thus, separate annular end piece means a separate piece attachable at the

end of the filter, annular in shape with protrusion.

**E.**   **"End Cap"**

**Parker's Proposed Construction:** "the component or components that cover the filter

element at the end of the filter."

**Wix's Proposed Construction:** "disk shaped member that is sealingly bonded to the filtration media."

### 1.    Parker's Position

Every claim of the oil filter patents contains a limitation directed to an "end cap."  "Cap" need not be confined to one-piece structures. A simple example is a baseball cap.  The patents doe not suggest that the "end cap" is only a filter media end cap, or that it must be a one-piece end cap. Rather, the "end cap" is clearly directed to the filter element end cap.  "End cap" does not means singular component that covers only the filter media as opposed to capping the filter element, as Wix argues.

### 2.    Wix's position

Each of the claims requires a pair of end caps, typically referred to as "first" and "second" end cap. Wix contends that the plain meaning of end cap should be applied here, as the specification's usage of the term is consistent with the ordinary meaning of the term.  The detailed description of the specification states:

> The element also includes a **disk-shaped end cap** 114 sealingly bonded (such as with adhesive) to the outer (upper) end of the media ring; and an opposite **disk-shaped end cap** 122 sealingly bonded (such as with adhesive) to the inner (lower) annular end of the media ring. (Ex. 1, '139 patent at col. 8, lines 34-39, emphasis added.)

### 3.    Claim Construction of "End Cap"

The parties agree that the term "end cap" is repeatedly used in the specification of the '139 patent.  The summary of the invention states:

> [T]he filter assembly includes a replaceable element with a ring of filtration media, and an **end cap** sealingly bonded to either end of the filtration media. (Doc. 139, Exh. 1, '139 patent, col. 2, lines 49-52, emphasis added.)

The specifications specifically define the shape of the end cap.  For instance, Figures 7 and 8 illustrate the embodiments of this end cap, a flat, disk-shaped member sealingly bonded to the filtration media.



Figure 8

The specification states:

> The element also includes a **disk-shaped end cap** 114 sealingly bonded (such as with adhesive) to the outer (upper) end of the media ring; and an opposite **disk-shaped end cap** 122 sealingly bonded (such as with adhesive) to the inner (lower) annular end of the media ring. (Doc. 139, Exh. 1, '139 patent at col. 8, lines 34-39, emphasis added.)

Thus, the shape of the end cap is "disk-shaped."

The parties dispute whether the end cap covers the "filtration media" (Wix) or the "filtration element" (Parker).  Parker argues other embodiments of end cap 114 are consistent with Parker's contentions and clearly show that the components comprising the end cap cover the filter element, citing to See Figs. 2, 3, 7, 10, 14 of the oil filter patents.

As noted above, the explicit language of the specifications, however, states that the end cap is sealingly bonded to the <u>filtration media</u>.  In addition, the claim language also states:

> "a first end cap sealingly bonded to the first end of the **filtration media**, and a second end cap sealingly bonded to the second end of the **filtration media** . . ."  (See e.g., '139 Patent, Claim 1; '851 Patent, Claim 1, '426 Patent, Claim 1) (emphasis added.)

Parker proposes a construction that "the component or components that cover the filter element at the end of the filter."  The claim language, however, does not support that the end cap is

23

composed of potentially multiple components.  While the language indicates two end caps, the end

caps themselves are not claimed to be multiple components. In addition, the claim language does not

mention the word "cover."  The claim language consistently refers to "sealingly bonded" to the end

of the filtration media.  The proposed term "cover" implies a removeability capability that is

inconsistent with the claim requirement that the end cap is "sealingly bonded."  Further, the claim

language does not support that the end cap is bonded to the filter element.  The claim language

explicitly states that the end cap is sealingly bonded to the filtration media.  Thus, the claim language

supports Wix's construction and the Court adopts this construction.

**F.      "Located against a surface of"**

      **Parker's Proposed Construction:** "located against a surface, irrespective of whether the

surfaces are perfectly flat or have a layer of something between them"

      **Wix's Proposed Construction:** Plain meaning - end piece rests against the surface of the

end cap.

      **1.      Parker's Position**

      Claim 1 of the '426 patent contains a limitation for the separate annular end piece to be

"located against a surface of" the first end cap.  An object is located against the surface of another

object does not change simply because a seal or adhesive is between them.  One object pressed

against another with an O-ring between them is certainly "located against a surface of" the object;

the O-ring simply provides a sealing relation between them.

      **2.      Wix's Position**

      Under plaintiff's construction, the "located against a surface of" an end cap would be met

even if they were not physically located against the surface of each other because there could be an

intervening sealing device or other structure.  The plain meaning of the separate annular end piece

"located against a surface of" the end cap is that the end piece be located against a surface of the end

cap. The specification's only disclosure of this is consistent:

                **End piece** 160 has an annular configuration, and **fits against the
inside surface of the end cap** 114. The end piece 160 can be
permanently fixed to the end cap, such as with adhesive, or can merely
be **located against the end cap** and held in place by friction fit, or by
the interaction with the locking member 76.  ('426 patent, col. 10, lines

20-25, emphasis added.)

This portion of the specification directly contradicts Plaintiff's proposed construction, as "located against the end cap" is explicitly described in this patent.  "Located against" does not to include "permanently affixing" such as with adhesive.

### 3.     Claim Construction of "Located against a surface of"

The specification language contradicts Parker's proposed construction.  "Located against" a surface does not include a bonding or adhesive medium between the surfaces.

> **End piece** 160 has an annular configuration, and **fits against the inside surface of the end cap** 114. The end piece 160 can be permanently fixed to the end cap, such as with adhesive, or can merely be **located against the end cap** and held in place by friction fit, or by the interaction with the locking member 76. ('426 patent, col. 10, lines 10-20, emphasis added.)

The specification addresses an adhesion layer - if there is an adhesion layer, the end piece is permanently affixed.  In the alternative, the end piece may be "located against" the end cap. "Located against," does not imply an intervening layer of "something," because a potential intervening layer was addressed in the preceding clause: "The end piece 160 can be permanently fixed to the end cap, **such as with adhesive** . ."  The alternative to adhesion, according to the specification, is that the pieces can be "located against" the end cap and together **by friction** or **interaction**.  Thus, the specification addresses "located against."  "[L]ocated against the end cap" is explicitly described in the patent **not to include** permanently affixing such as with adhesive. Accordingly, the Court adopts Wix's construction.

### G.     "Surface-to-Surface"

**Parker's Proposed Construction:** "surface-to-surface contact or relation, irrespective of whether the surfaces are perfectly flat or have a layer of something between them."

**Wix's Proposed Construction:** Plain meaning.

### 1.     Parker's Position

Like its position in "Located against a surface of," Parker argues that whether there is some form of intervening layer, e.g., a seal or adhesive, is irrelevant.  Surfaces glued together are in "surface-to-surface" contact; the glue ensures that the surface-to-surface contact is relatively

permanent and the intervening layer of glue does not change this characterization of the relation between surfaces.

### 2.    Wix's Position

Same as in "Located against a surface of."

### 3.    Claim Construction of "Surface-to-Surface"

The distinction between the "located against a surface of" and "surface-to-surface" is how the term "surface-to-surface" is used in the claims:

> "The filter element as in claim 1, wherein said second end cap has an annular body portion with a surface that is **sealingly bonded** in **surface-to-surface** contact with an annular end surface of the filtration media ring." (See generally Claim 11 of the '139 patent; claims 11 and 23 of the '851 patent; Claims 8 of the '426 patent.)

By this language, the claims contemplate an adhesion layer which would still yield "surface-to-surface" contact.

The claims also refer to surface-to-surface without bonding:

> "The filter element as in claim 16, wherein said end cap assembly further comprises an annular end piece located in **surface-to-surface** relation with a surface of the first annular end cap, the protrusions being unitary with the annular end piece." (Claim 17 of the '426 patent;  Claim 9 of the '537 patent.)

Similar to the claim construction of "located against a surface of," the specifications state when an adhesion layer in contemplated for "surface-to-surface contact."  However, "surface-to-surface" is broader because an adhesion layer is built into the "surface-to-surface" contact.  Accordingly, "surface-to-surface" is not abrogated whether held together with adhesion or not.  Therefore, "surface-to-surface" contact has its plain and ordinary meaning.

### H.    "Flat"

**Parker's Proposed Construction**: "having its major surface essentially planar and distinctly greater than the minor surfaces."

**Wix's Proposed Construction:** plain and ordinary meaning

### 1.    Parker's Position

"Flat" is used in connection with "flat annular end cap" and "inner flat surface."  The word "flat" should be construed as having the major surface essentially parallel and distinctly greater than

the minor surfaces. See, e.g., Webster's New Collegiate Dictionary (Merriam-Webster, 1987). "Flat annular end cap" means the component or components that cover the filter element at the end, configured or arranged as a ring, the major surface of which is essentially planar and distinctly greater than the minor surfaces. Given this definition of "flat," and the definition of "inner surface" previously provided (any inside surface of the end cap assembly, whether in the radial, angular, or axial dimension), the term "inner flat surface" means the radially, axially, or angular inner surface that is essentially planar and distinctly greater than the minor surfaces.

Wix's construction is wrong because every "flat annular end cap" embodiment has at least one outwardly-extending tab, inwardly extending protrusion and/or flange, raised or tapered edge, etc. See, e.g., "end cap 114" and/or "end cap 122" at Fig. 2, 3, 7, 10 of oil filter patents.

### 2.   Wix's Position

Flat means flat. The term "flat" in relation to an end cap is easily understood by a review of the Figures in the specifications.

### 3.   Claim Construction of "flat"

Flat has its plain and ordinary meaning. According to the Oxford English Dictionary, "flat," as relevant to this case, means "Horizontally level; without inclination." *Oxford English Dictionary*, http://dictionary.oed.com/cgi/entry/, (Last visited on March 13, 2008); "Having a horizontal surface in which no part is higher or lower than another." *Webster's Dictionary*, http://www.websters-online-dictionary.org/definition/flat (Last visited on March 13, 2008). "[H]aving a continuous horizontal surface;" resting with a surface against something;" and "being or characterized by a horizontal line or tracing without peaks or depressions." *Merriam-Webster's Collegiate Dictionary* 476 (11th ed. Merriam Webster 2003.)

There is a "heavy presumption" that a claim term carries its ordinary and customary meaning. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002); *Kegel Co., Inc. v. AMF Bowling, Inc.*, 127 F.3d 1420, 1427, (Fed Cir. 1997) (using Webster's Third New International Dictionary to define the claim term "assembly").

The ordinary meaning of some claim terms "may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of widely accepted meaning

of commonly understood words." *Agfa Corp. v. Creo Products Inc.*, 451 F.3d 1366, 1376 (Fed. Cir. 2006), *citing Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed.Cir.2005) (en banc).

The Court construes "flat" as flat.

**PART II**

**CLAIM CONSTRUCTION IN THE**

**FUEL FILTER PATENTS ('168 PATENT FAMILY)**

The '168 patent describes a "latch-and-valve mechanism" which is intended to insure that only the proper filter element can be used in a filter housing. By the use of the valve, the flow of fuel is shut off when no element is present. (Ex. 5, '168 patent, col. 2, lines 50-55.)

The '168 patent discloses a keyed valve for a fuel filter. The valve locks in the closed position and needs to be unlocked by a filter before fuel can flow through the filter housing. (See, e.g., Ex. 5, '168 patent, col. 3, line 65 – col. 4, line 15; col. 4, lines 16-29; see also Abstract.) The majority of the '168 patent describes this keyed latch valve mechanism that surrounds the standpipe and includes a valve device and a latch device. (Ex. 5, '168 patent, col. 2, line 56 – col. 3, line 21.) See Figure 3 reproduced below.





The valve device 64 (shown in Figure 8 above) includes base 72. Tabs 76 extend outwardly from the sleeve, and define a series of slots 78. The latch 68 includes fingers 80, each of which has radially-inward ends 82. The fingers are forced slightly outwardly when the latch is in the locked position. The latch is located between the valve and the lower end of the filter housing as shown in Figures 3 and 4.

A spring 90 urges the latch 68 and valve device 64 upwardly such that the sleeve 70 of the valve device is normally blocking the opening 49. In this closed position (shown on the left side of Figure 4 reproduced below), the fingers 80 are received in the groove 62 in the standpipe, to lock the latch, which also prevents the valve device 64 from moving downward.

---------------------------------------

U.S. Patent Nos. 6,797,168 ("the '168 patent"), 7,070,692 ("the '692 patent"), and 7,163,623 ("the '623 patent") are referred to as the "fuel filter patents" and also as the "'168 patent family" by the parties.  The disputed terms are listed below.

A.    **"Valve-actuating portion"**

**Parker's Proposed Construction:**  "region of the filter element whereby engagement with a valve mechanism can take place."

**Wix's Proposed Construction:** the portion of the bottom end cap that includes the cylindrical portion, the annular base, and the keys.

### 1.   Parker's Position:

The claims of the patents confirm that the "valve actuating portion" is a region of the filter element whereby engagement with a valve mechanism can take place.  The specification describes the "valve-actuating portion" in terms of structure as well as function. In terms of structure, the specification states that the second end cap has a valve actuating portion, which "includes an axially extending cylindrical portion connected to the annular end cap portion and circumscribing the inner diameter of the annular end cap portion." ('168 patent col. 2:41-43; '692 patent col. 2:53-55; '623 patent col. 2:59-61.)  In terms of function, "[a]t least one key is provided with the valve actuating portion having an engaging portion . . . ." ('168 patent col. 2:46-49; '692 patent col. 2:58-61; '623 patent col. 2:64-67.)

If the term "value actuating portion" were construed to mean the portion of the bottom end cap that includes the cylindrical portion, the annular base and the key, then these terms would be rendered meaningless as redundant (subsumed into definition of valve actuating portion.).  See *RF Delaware, Inc. v. Pacific Keyston Tech., Inc.*, 326 F.3d 1255 (Fed. Cir. 2003).  Wix's proposed construction improperly adds a "bottom" end cap limitation depending on whether the filter element is right side up or upside down.

### 2.   Wix's Position

Parker acted as its own lexicographer and defined a term in the specification.  In multiple places, the patent explains that the valve-actuating portion is made up of three elements: (i) the cylindrical portion; (ii) the annular base; and (iii) a plurality of keys. (See e.g. Ex. 7, '623 patent, col. 2, lines 58-67; col. 8, lines 26-46.)  Plaintiff's proposed construction is once again overbroad: "a region of the filter element whereby engagement with a valve mechanism can take place." (Parker's Op. Markman Br., at 24-25.) The problem with this proposed construction is that it essentially reads out of the claim term specifically that which the specification clearly associated with the "valve-actuating portion" in the patent.

/////

30

### 3.   Claim Construction of "Valve-actuating portion"

Each of the claims of the '168 patent, and several of the claims of the '692 and '623 patents require a "valve-actuating portion."  The claims define the components of the "valve-actuating portion:"

· The '168 Patent:
> o Independent Claim 1: "a valve-actuating portion, including an axially extending cylindrical portion . . . and an annular base . . . and a plurality of keys . . . ."
> o Independent Claims 9 and 21: "the valve-actuating portion including: I) a cylindrical portion . . .; ii) an annular base . . .; and iii) a plurality of discrete keys . . . ."

· The '692 Patent:
> o Independent Claim 1: "a valve-actuating portion, including a cylindrical portion . . . and an annular base . . ., a sealing device . . .; and a plurality of keys . . . ."
> o Independent Claim 7: "a valve-actuating portion, including an axially extending cylindrical portion . . ., and an annular base . . ., a sealing device . . ., and a plurality of keys . . . ."

· The '623 Patent:
> o Independent Claim 1: "a valve-actuating portion, including a cylindrical portion . . . and an annular base . . ., a flexible sealing device . . .; and a plurality of keys . . . ."
> o Independent Claim 10: "a valve-actuating portion, including an axially extending cylindrical portion . . ., and an annular base . . ., a flexible sealing device . . .; and a plurality of keys . . . ."

The specification states: "The lower end cap 96 also has a valve-actuating portion, indicated generally at 102.  The valve-actuating portion 102 includes a cylindrical portion 104 bounding the central opening 101 and extending axially inward into the central activity 93 to a distal inner end."  (See Doc. 139, Exh. 7, '623 patent, col.8 lines 26-31.)  The specifications also state: "the lower end cap 96, including the annular portion 100 and the valve actuating portion 102 (including keys 116) is also preferably formed unitarily from an appropriate material such as an inexpensive plastic.  (Doc. 139, Exh. 7, '623 patent, col. 9 line 19-22.)

Parker proposes that the Court constructs "valve-actuating portion" as "region of the filter element whereby engagement with a valve mechanism can take place."  This construction, however, is overly broad because it does not include the specific components identified in the claims and specifications. The valve actuating portion includes "a cylindrical portion" and "an annular base" and 'a plurality of thin, flat keys."  As representative of the language defining the components, the Abstract of the '692 and '623 patents sets forth the meaning of "valve-actuating portion:"

> The element has an end cap with a valve actuating portion. The valve actuating portion **includes a cylindrical portion** and **an annular base** projecting radially inward from the cylindrical portion. The valve actuating portion includes **a plurality of thin, flat keys** spaced around the annular base and projecting radially inward from the cylindrical portion and axially outward from the base.  (Doc. 139, Exh. 7, '623 patent, Abstract.)

On the other hand, Wix proposes a construction that the valve-actuating portion is the portion of the bottom end cap that includes the cylindrical portion, the annular base, and the keys.  This construction is too narrow because it limits the valve actuating portion to the bottom end cap.  The terms of "valve-actuating portion" do not so limit the "valve-actuating portion" solely to the **bottom** end cap.  For instance, the Abstract, quoted above, does not reference the bottom end cap.

Here, Parker assigned component parts to the term "valve-actuating portion."  "[A]s a matter of statutory authority, a claim term will cover nothing more than the corresponding structure or step disclosed in the specification, as well as equivalents thereto, if the patentee phrased the claim in step-

32

or means-plus-function format." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed.Cir. 2002) (we hold that the claim term "reciprocating member," as used in the asserted patents, encompasses the **multi-component**, curved structure used by the accused exercise machines.   . . It is not limited to a straight-bar structure comprising a single component only.)  The term "includes" embraces at least the elements recited.  *CollegeNet, Inc.*, 418 F.3d at 1235.

Parker argues that subsuming these component parts - cylindrical portion, annular base and keys - into the "valve actuating portion" will be redundant, eliminating the individual terms' meaning.  The Court disagrees that each term has lost its meaning - as shown in this instant claim construction of "annular base" and "keys."  However, the Court agrees with Parker that the "valve actuating portion" also has a functional aspect. In terms of function, "[a]t least one key is provided with the valve actuating portion having an engaging portion . . . ." ('168 patent col. 2:46-49; '692 patent col. 2:58-61; '623 patent col. 2:64-67.)  The term "actuate" or "actuating" means to put into action or motion; to trigger an action. *Webster's Dictionary*, http://www.websters-online-dictionary.org/definition/actuate (Last visited on March 13, 2008). Thus, the term "valve-actuating portion" is construed to be both structural and functional.  Accordingly, the Court construes "valve-actuating portion" to include the cylindrical portion, the annular base, and the keys, which engage the value mechanism.

**B.     "Annular Base"**

**Parker's Proposed Construction:** "a component or components, configured or arranged as a ring (continuous or noncontinuous), that is located near the end of a structure or that act to support something."

**Wix's Proposed Construction:** "an annular (ring-shaped) portion that projects radially inwardly from the cylindrical portion and that forms an inner or central opening that fits closely around the valve sleeve or standpipe, depending upon the application."

**1. Parker's Position**

The word "annular" is used in the specification to refer to examples of structures which are configured or arranged as either a continuous, or a noncontinuous, ring.  While these structures are, in the shape of a continuous annular ring, other structures are noncontinuous and are described as

"annular." For instance, the specification states that "[t]he latch device from the valve structure  a series of deformable fingers in **an annular array** closely surrounding the pipe." ('692 patent at 3:22-24.) This shows that the term "annular" is used in the patent to describe a non-continuous objects in an annular configuration.  The patent further describes an "annular base," but never requires that it be a continuous annular structure (as Wix argues). Claim 30 of the '168 fuel filter patent further confirms that "annular base" can be a noncontinuous structure configured as a ring. That claim reads: "The filter element as in claim 21, wherein the cylindrical portion and annular base are imperforate."

### 2.      Wix's Position

Nearly all of the claims in the '168 family require that the filter element include an "annular base."  The specification refers repeatedly to an "annular base" 108 to describe specific structures located in the inner part of the filter element.  Each of the embodiments described and illustrated an annular base that is ring-like and continuous.  This embodiment is shown in Figure 5, reproduced below (Doc. 139, Exh. 7, '623 patent):



The Summary of the Invention emphasizes that in the invention the inner opening closely surrounds either the valve sleeve or the standpipe, depending on the particular embodiment.

Plaintiff essentially argues that the annular base may be a series of components arranged as a

ring that act to support something, a construction so broad that is unsupported by the specification. The claim language requires that the base be "annular", which means ring-shaped. It does not claim multiple components "arranged as a ring." Furthermore, as described in the patent the annular base is used to affect a proper seal between the filter and the sleeve or inlet pipe, depending upon the particular embodiment. To make a seal, the base needs to be solid and continuous.  Also the patent specification makes clear that the annular base bounds a central opening that is circular in cross-section, closely dimensioned to receive a pipe. (Ex. 7, '623 patent, col. 2, lines 61-64; col. 3, lines 61-65; col. 8, lines 30-37.)

### 3.      Claim Construction of "Annular Base"

`The Abstract of the '692 and '623 patents states:

> A filter element removeably located in a housing having a central valve structure. The element has an end cap with a valve actuating portion. The valve actuating portion includes a cylindrical portion and **an annular base** projecting radially inward from the cylindrical portion. The valve actuating portion includes a plurality of thin, flat keys spaced around the annular base and projecting radially inward from the cylindrical portion and axially outward from the base. . . .

The Summary of the Invention states, in pertinent part:

> The lower end cap has an axially-extending cylindrical portion connected to and bounding the inner diameter of the annular end cap portion, and an annular base projecting radially-inward from the cylindrical portion. The annular base closely surrounds the sleeve of the valve device in the first embodiment, and the inlet pipe in the second embodiment.

(Doc. 139, Exh. 7, '623 patent, col. 3, lines 59-65.)

Parker essentially argues that the annular base may be a series of components arranged as a ring that act to support something.  Parker argues the term is used in numerous places in the fuel filter patents' specifications. In particular, the specification states that "[t]he latch device  from the valve structure includes a series of deformable fingers in **an annular array** closely surrounding the pipe." ('692 patent at 3:22-24.)  Parker argues that the term "annular" is thus used to describe non-continuous ring in an annular arrangement.  In this example, however, the term "annular" describes the positioning or arrangements of the deformable fingers - in an array which is annular.

Parker also argues that Claim 30 of the '168 fuel filter patent further confirms that "annular

35

base" can be a noncontinuous structure configured as a ring, since the annular base in that claim is required to be imperforate.

Claim 30 of the '168 patent states:

> the filter element as in claim 21, wherein the cylindrical portion **and the annular base are imperforate**. (Doc. 139, Exh. 5, '168 patent, claim 30) (emphasis added).

Claim 30 does not state that the "annular base" is imperforate. Rather, it claims that the cylindrical portion **and** the annular base, together, are imperforate. Claim 30 requires that two different elements (the cylindrical portion and the annular base) are imperforate. In addition, claim differentiation applies in the situation where there is a limitation added by a dependent claim, such that the independent claim is typically presumed to be broader and of different scope than the dependent claim with the additional limitation. *See Phillips*, 415 F.3d at 1315;

According to *Merriam-Wester's Collegiate Dictionary*, the term "annular" means "of, relating to, or forming a ring." *Merriam-Wester's Collegiate Dictionary*, 40 (11th Ed. 2003). The claim language does not support a construction of "non-continuous." A "base" is "The bottom of anything, considered as its support, or that on which something rests for support; the foundation." http://www.webster-dictionary.net/d.aspx?w=base (Last visited March 13, 2008).

Wix, on the other hand, proposes that the construction of "annular base" also include the terms: "an annular (ring-shaped) **portion that projects radially inwardly from the cylindrical portion and that forms an inner or central opening that fits closely around the valve sleeve or standpipe, depending upon the application**." (Emphasis added). There is nothing in the claim language that includes the function of the annular base in the claim. The proposed construction by Wix unnecessarily limits the base which is not claimed in the specifications and the claims.

**C.    "Keys"**

**Parker's Proposed Construction:** "an element that protrudes or projects from the surface of another element and that can engage or actuate another element or mechanism or element."

**Wix's Proposed Construction:** "protrusions that operate to unlock a latch device and move a valve device."

### 1.   Parker's Position

The '168 patent is entitled "Keyed Latch Valve for Fuel Filter," and the '692 and '623 patents are entitled "Fuel Filter with Keys." The specification makes clear that the keys need not be of any specific size or shape:

> [E]ach key can have a "step," that is, an axially longer and radially thinner portion as at 218, and an axially shorter and radially wider portion as at 219. Again, the number, location and dimension of the keys can vary depending upon the particular application. ( '168 patent, col. 13:26-30; '692 patent col. 14:13-18; '623 patent col. 14:18-22. (See also '168 patent at 12:21; '692 patent col. 12:67; '623 patent col. 13:13 ("each key can also be simply straight").)

Figure 6 of the fuel filter patents depicts an embodiment where the key is stepped; the key protrudes from the cylindrical portion, and thus can engage a latch device.



**Fig. 6**

This is consistent with the use of key in the mechanical arts. Garris Decl. ¶ 11.  Wix's construction is problematic because it tries to limit the term "keys" to protrusions that act "to unlock the latch device and move the valve device."

### 2.   Wix's Position

Each and every claim of the '168 patent family includes the term "keys."  Wix's construction

37

is consistent with the ordinary meaning of a "key," which is a device or structure that unlocks something. This unlocking functionality of the keys is central to the alleged invention. As first stated in the Abstract:

> A filter element has an end cap with thin, flat keys. The keys project through the slots in the valve device and engage the sleeve of the latch device to unlock the latch device from the pipe, and also engage and move the valve device to uncover the opening in the pipe, when the filter element is inserted into the housing.

(Doc. 139, Exh. 5, '168 patent, Abstract.)  An unlocking mechanism by the keys is described in the specification:

> As the element is inserted into the housing, the lower free edges of the **keys press down** against the sleeve 84 of the latch device, and cause the latch device to bend outwardly and pull the fingers 80 radially outward from the standpipe. As the fingers are pulled outward, the distal ends 82 of the fingers are pulled outward from groove 62, thus **releasing the latch device** and allowing the latch device to slide axially downward along the standpipe. Again, it is possible that only a single key extending through the slots in the latch device may suffice to unlock the latch device, although that this nay (sic) cause locking of the element and/or the latch device, and so at least three equally-spaced keys are preferred.
>
> In any case, simultaneously with the fingers being released by the engagement of the keys against the sleeve, the radially wider and axially shorter portions 119 of **the keys engage** the upper surface of the annular base 72 of **the valve device and push the valve device axially downward** along the standpipe. The keys are dimensioned to push the valve device downward sufficient to fully uncover opening 49 (see the right-hand side of FIG. 4). After the element is installed, fluid can pass through opening 49 in the standpipe, and thus pass to outlet port 39. (Ex. 5, '168 patent, col. 8, line 58 – col. 9, line 12)(Emphasis added)

Plaintiff's construction would essentially only require that the "key" be a "protrusion."  Plaintiff's construction ignores the fact that the entire patent specification of the '168 patent family is directed to the details concerning how to unlock and open this latch-and-valve mechanism.  The plain meaning of the term "key" implies some locking and unlocking capability.

### 3.    Claim Construction of "key"

The parties agree that "keys" are protrusions.  Indeed, the specification states a structural

element of the keys:

> "A plurality of keys, as at 116, are provided internally of the valve-actuating portion 102.  Keys 116 are illustrated as thin and flat strips, with opposing planar side surfaces facing essentially perpendicular to the central axis of the element.  The keys are also illustrated as being equally-spaced in spoke-like arrangement around the interior of the valve actuating portion.  Each key has one edge attached directly to the cylindrical portion 104 and another edge attached directly to the annular base 108, although the keys could be attached to just one of these elements."  (Doc. 139, Exh. 5, '168 Patent, col 8 lines 10-19.)

In addition to the structure, the keys have a functional purpose.  he keys operate to release a latch device:

> "As the [valve device] is inserted into the housing the lower free edges of the keys press down against the sleeve 84 of the latch device, and cause the latch device to bend outwardly and pull the fingers 80 radially outward from the standpipe . . . thus releasing the latch device . . ."  (Doc. 139, Exh. 5, '168 Patent, col 8 lines 57-64.)

An operate to engage the valve device:

> "In any case, simultaneously with the fingers being released by the engagement of the keys against the sleeve, the radially wider and axially short portions 119 of the keys engage the upper surface of the annular base 72 of the valve device and push the valve device axially downward along the standpipe.  The keys are dimensioned to push the valve device downward sufficient to fully uncover opening 49."  (Doc. 139, Exh. 5, '168 Patent, col 9 lines 4-10.)

As shown from all of the above specifications, the "keys" both "unlock" or "release" a latch device and also engage or actuate valve device.  Any definition which does not include both structure and function fails to properly construe the term "keys."  Accordingly, the Court construes "keys" as "protrusions that  unlock or release a latch device and also engage or actuate valve device**.**"

**D.     "Freely supported"**

   **Parker's Proposed Construction:** "supported by the component forming the edge, but unsupported by any external component along the length of that edge."

   **Wix's Proposed Construction:** the term is incapable of being construed and is indefinite under 35 U.S.C. §112, ¶2.

   **1.     Parker's Position**

   The term "freely supported" appears in the '692 patent (claims 1, 7, 13) and the '623 patent

(claims 1, 10, 19, 20, and 33). It is a descriptor applied to an "edge" described in the various claims. The phrase has its ordinary meaning with regard to the edge that it modifies: supported, yet the edge is uninterrupted and thus is free to engage another element or mechanism. "[T]he definiteness of claim terms depends on whether those terms can be given any reasonable meaning." *Datamize, LLC,* 417 F.3d at 1347. "Supported" needs no construction; it is common sense that the edge of a key that is attached to the filter element would be supported in some way. The descriptor "freely," applied to the term edge (of a key), like the term "free," means that the edge of the key is unencumbered.

### 2.     Wix's Position

The claims of the '692 and '623 patents use the term "freely supported" to describe an edge of the keys. Each of the independent claims of the '692 patent (claims 1, 7 and 13) require that there be keys, on which "a radially inner side edge freely supported. . ." while each of the independent claims of the '623 patent also require that there be an edge "freely supported."

The specification does not utilize the phrase "freely supported" anywhere. Instead, the specification describes that the keys have one free axially outward edge, and one free edge radially inward:

> One free edge of each key extends axially outward, in a direction away from annular base 108, while another free edge extends radially inward in a direction from the cylindrical portion toward the central axis to bound an imaginary cylinder circumscribing the central axis and located radially between the first central opening and the second central opening.

(Ex. 7, '623 patent, col. 8, lines 61-67; see also col. 14, lines 13-17.)

### 3.     Claim Construction of "Freely supported"

The court does not lightly consider that a term is invalid for indefiniteness. Courts should construe claims to preserve their validity. *Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1356 (Fed. Cir. 1999), cert denied, 529 U.S. 1037 (1999). "If the claim is subject to interpretation, i.e., it is not insolubly ambiguous, it is not invalid for indefiniteness." *Bancorp Servs.v. Hanford Life Ins. Co.*, 359 F.3d 1367, 1371 (Fed. Cir. 2004). "[T]he definiteness of claim terms depends on whether those terms can be given any reasonable meaning." *Datamize, LLC,* 417 F.3d at 1347.

The claims of the '692 and '623 patents use the term "freely supported" to describe an edge of the keys. The claims state in relevant part:

> "each key having 1) a radially outer side fixed to and supported by the cylindrical portion, ii) a distal, axially out end toward the second end of the element with a free edge, iii) an axially inner end toward the first end of the element, and iv) a radially inner side toward the central axis with an edge freely supported and spaced radially inward from the first cental opening." (See e.e, '623, claim 1, Col 16, lines 15-20.)

The specification makes clear that the keys need not be of any specific size or shape:

> [E]ach key can have a "step," that is, an axially longer and radially thinner portion as at 218, and an axially shorter and radially wider portion as at 219. Again, the number, location and dimension of the keys can vary depending upon the particular application. '168 patent, col. 13:26-30; '692 patent col. 14:13-18; '623 patent col. 14:18-22. (See also '168 patent at 12:21; '692 patent col. 12:67; '623 patent col. 13:13 ("each key can also be simply straight").

The term "freely supported" is construed in conjunction with the "step" configuration. The court construes "freely supported" as the edge that is "unencumbered."

**E.    "Central Opening which can Receive a Pipe"**

**Parker's Proposed Construction:** Plain and ordinary meaning.

**Wix's Proposed Construction:** "a circular central opening defined by the inner circular surface of the annular base."

**1.    Parker's Position**

All but two independent claims of the fuel filter patents contain a limitation for the annular base to "define a (first or second) central opening which can receive a pipe." The term "define a [ ] central opening" simply labels the opening created by the continuous or noncontinuous ring. There is no need to construe this term. The remaining terms require no explanation. Wix apparently argues that the "central opening" must be a circle. There is nothing by way of intrinsic or extrinsic evidence to support such a restriction. Claims are not restricted to the specific embodiments or examples that appear in the specification.

**2.    Wix's Position**

Virtually all of the claims also require that the annular base "define a [] central opening which can receive a pipe." The patent specification again makes clear that the annular base bounds

this central opening, and that the dimension of the central opening is such that it is closely received about the pipe.

### 3.   Claim Construction "Central Opening which can Receive a Pipe"

"Generally, terms in a patent claim are given their plain, ordinary, and accustomed meaning to one of ordinary skill in the relevant art."  The plain and ordinary meaning of the words do not need any construction. *Chef America, Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1373 (Fed. Cir. 2004) ("These are ordinary, simple English words whose meaning is clear and unquestionable. There is no indication that their use in this particular conjunction changes their meaning. They mean exactly what they say."); *Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 318 F.3d 1143, 1148 (Fed. Cir. 2003), *appeal after remand*, 412 F.3d 1284 (Fed. Cir. 2005) ("After identifying the plain meaning of a disputed claim term, the court examines the written description and the drawings to determine whether use of that term is consistent with the ordinary meaning of the term.")

Wix argues that each of the embodiments in the '623 patent illustrate a ring-shaped annular base with a circular central opening (as defined by the interior of the annular base's internal opening).  However, Wix's proposed construction would limit the invention's "central opening" to solely the embodiments.  Accordingly, Wix's construction is rejected.  The Court adopts the plain and ordinary meaning.

### F.   "Distal," "Free-Engaging Portion (end)," "Flat," and "End Cap Assembly"

The parties dispute whether these terms are in dispute for the '168 patent family.  Wix says the terms are not in dispute.  Parkers argues that unless Wix stipulates that it will not assert these terms as grounds for non-infringement, then the terms should be construed by the Court at this time.

#### "Distal"

Parker's Proposed Construction: "farthest from or away from"

Wix does not believe "distal" needs a construction.

### 1.   Parker's Position

Neither party asserts that this term requires construction, but the parties need to develop a glossary of terms to benefit the Court and jury.

### 2.   Wix's Position

42

Wix agrees to a glossary of terms.

### 3.      Claim Construction

By the parties' agreement, the term is not presented to the Court for construction.

**"Free-Engaging Portion (end)"**

Parker's Proposed Construction: "a portion [end] of an element that is free to engage another element or mechanism"

Wix:   No construction needed

### 1.      Parker's Position

Wix does not contend that these terms require construction. As described in its Opening Brief, Parker's constructions are fully supported by the intrinsic and extrinsic evidence. Consequently, Parker's constructions for these terms should be adopted.

### 2.      Wix's Position

Wix does not believe the terms need a construction because there is no dispute and the ordinary meaning applies.

### 3.      Claim Construction

Since there is no dispute, Parker's construction is adopted.

**"Flat"**

**Parker's Proposed Construction:** "having the major surface essentially planar and distinctly greater than the minor surfaces."

**Wix's Proposed Construction:** plain and ordinary meaning.

### 1.      Parker's Position

For the '168 patent family, same argument as the "flat" argument for '139 patent family.

### 2.      Wix's Position

Wix does not believe this term needs construction in either patent family as the plain meaning applies ("flat means flat"), but more importantly, there is no dispute between the parties concerning the term "flat" as used in the '168 patent family. Thus, there is no reason for the Court to construe this term in the '168 patent family. *Vivid Techs.*, 200 F.3d at 803.

### 3.     Claim Construction of "Flat"

For the same reasons stated above on "flat" - flat means flat.


**"End Cap Assembly"**

**Parker's Proposed Construction:** "collection of components including or comprising an end cap"

**Wix's Proposed Construction:** no construction needed.

### 1.     Parker's Position

As in the oil filter patents, the term "end cap assembly" should be construed the same way. The claims of the patents themselves confirm that an "end cap assembly" is comprised of components, and the claims further define the basic components of the "end cap assembly":

- · The '692 Patent:
  - o Independent Claim 13: ". . . the second end cap assembly including: I) an annular end cap portion . . .; ii) a cylindrical portion . . .; iii) an annular base . . .; iv) a sealing device . . .; and v) a plurality of thin, flat keys . . . ."
- · The '623 Patent:
  - o Independent Claim 19: ". . . the second end cap assembly including: i)an annular end cap portion . . .; ii) a cylindrical portion . . .; iii) an annular base . . .; iv) a sealing device . . .; and v) a plurality of t[h]in, flat keys . . . ."
  - o Independent Claim 20: ". . . the second end cap assembly including: I) an annular end cap portion . . .; ii) a cylindrical portion . . .; and iii) a plurality of keys . . . ."
  - o Independent Claim 33: ". . . the second end cap assembly including: i)an annular end cap portion . . .; ii) a cylindrical portion . . .; and iii) a plurality of keys . . . ."

It means a collection of components including or comprising an end cap, as Parker has expressly defined it as such in the claims themselves.

### 2.     Wix's Position

Parker contends that "end cap assembly" should be construed to mean a "collection of components including or comprising an end cap" in the '168 patent family, which is the same proposed construction as this term in the distinct '139 patent family. Wix submits that this is incorrect for several reasons.

First, there is simply no dispute between the parties as to the term "end cap assembly" as it is used here in the '168 patent family. Thus, no construction of this term is necessary or appropriate.

*Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999). Second, Plaintiff's proposed definition is again overbroad, and seemingly would encompass anything so long as it included an end cap. Instead, the disclosure in the specification of the elements attached to the bottom end cap (a cylindrical portion, an annular base, and keys: namely, the valve-actuating portion) limits the meaning of the second end cap assembly. Indeed, there is no mention of any "end cap assembly" anywhere in the specification; this language exists solely in the claims of the continuation '692 and '623 patents.

> **3.     Claim Construction of "end cap assembly"**

For the same reasons as discussed in the '139 patent "end cap assembly," the end cap assembly here includes the parts so listed.  The language has the practical effect of limiting the scope of the end cap assembly to require **at least** the recited elements.

Accordingly, the Court construes the end cap assembly as:  collection of components comprising the end piece of at least a combination of an annular end cap portion, a cylindrical portion,  an annular base, a sealing device and a plurality of thin, flat keys.

IT IS SO ORDERED.

**Dated:     March 14, 2008**                          **/s/ Lawrence J. O'Neill**
                                                                    UNITED STATES DISTRICT JUDGE